1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                 FOR THE EASTERN DISTRICT OF CALIFORNIA

10    GLENN T. MASON,

11              Plaintiff,                No. CIV S-04-1123 FCD EFB P

12          vs.

13    M. SANDHAM, et al.,

14              Defendants.               <u>FINDINGS AND RECOMMENDATIONS</u>

15    _____/

16          Plaintiff is a state prisoner proceeding *pro se* and *in forma pauperis* with a civil rights

17    action pursuant to 42 U.S.C. § 1983.  His complaint, filed June 10, 2004, alleges that defendants

18    Roche, James, Hlusak, and Stovall were deliberately indifferent to his medical needs in violation

19    of the Eighth Amendment by delaying adequate medical treatment for his progressively painful

20    and visually impairing eye disease.  Defendants move for summary judgment, arguing that

21    plaintiff received adequate treatment, and that his vision worsened as the result of the

22    progression of his disease and not due to inadequate medical care.  Plaintiff also moves for

23    summary judgment, contending that defendants unreasonably delayed the recommended course

24    of action as prescribed by a consulted specialist, resulting in his suffering undue pain and

25    protracted vision problems.  For the reasons set forth below, the court recommends that

26    defendants' motions for summary judgment be granted and that plaintiff's motion for summary

1

1  judgment be denied.

2  **I. Summary Judgment Standards under Rule 56**

3        Summary judgment is appropriate when it is demonstrated that there exists "no genuine

4  issue as to any material fact and that the moving party is entitled to a judgment as a matter of

5  law." Fed. R. Civ. P. 56(c).

6                      Under summary judgment practice, the moving party
7                      always bears the initial responsibility of informing the district
                    court of the basis for its motion, and identifying those portions of
8                      "the pleadings, depositions, answers to interrogatories, and
                    admissions on file, together with the affidavits, if any," which it
9                      believes demonstrate the absence of a genuine issue of material
                    fact.

10  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). "[W]here the

11  nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary

12  judgment motion may properly be made in reliance solely on the 'pleadings, depositions,

13  answers to interrogatories, and admissions on file.'" *Id.* Indeed, summary judgment should be

14  entered, after adequate time for discovery and upon motion, against a party who fails to make a

15  showing sufficient to establish the existence of an element essential to that party's case, and on

16  which that party will bear the burden of proof at trial. *See id.* at 322. "[A] complete failure of

17  proof concerning an essential element of the nonmoving party's case necessarily renders all

18  other facts immaterial." *Id.* In such a circumstance, summary judgment should be granted, "so

19  long as whatever is before the district court demonstrates that the standard for entry of summary

20  judgment, as set forth in Rule 56(c), is satisfied." *Id.* at 323.

21        If the moving party meets its initial responsibility, the burden then shifts to the opposing

22  party to establish that a genuine issue as to any material fact actually does exist. *See Matsushita*

23  *Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In attempting to establish the

24  existence of this factual dispute, the opposing party may not rely upon the allegations or denials

25  of its pleadings but is required to tender evidence of specific facts in the form of affidavits,

26  and/or admissible discovery material, in support of its contention that the dispute exists. *See*

Fed. R. Civ. P. 56(e); *Matsushita*, 475 U.S. at 586 n.11.  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, *see Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."  *T.W. Elec. Serv.*, 809 F.2d at 631.  Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"  *Matsushita*, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any.  Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed.  *See Anderson*, 477 U.S. at 255.  All reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party.  *See Matsushita*, 475 U.S. at 587.  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn.  *See Richards v. Nielsen Freight Lines*, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), *aff'd*, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  *Matsushita*, 475 U.S. at 587 (citation omitted).

////

1    On April 12, 2005, the court advised plaintiff of the requirements for opposing a motion

2    pursuant to Rule 56 of the Federal Rules of Civil Procedure.  *See Rand v. Rowland*, 154 F.3d

3    952, 957 (9th Cir. 1998) (en banc), *cert. denied*, 527 U.S. 1035 (1999), and *Klingele v.*

4    *Eikenberry*, 849 F.2d 409 (9th Cir. 1988).

5    **II. Evidentiary Objections**

6    Defendants assert several objections to evidence submitted by plaintiff in support of his

7    motion for summary judgment.  Those objections, other than the bare assertion that plaintiff's

8    documents lack authentication and are hearsay, are unsupported with reasoned analysis.  For the

9    reason stated below, they are overruled.

10   Plaintiff's evidence and defendants' objections cannot be divorced from the nature of this

11   proceeding, i.e., summary judgment, in which defendants are the moving parties.  *See Burch v.*

12   *Regents of the University of California*, 433 F.Supp.2d 1110, 1118-1124 (E. D. Cal. 2006).  The

13   portion of the Rule 56, governing a motion supported by affidavits and records, provides that the

14   affidavits "shall set forth such facts as would be admissible in evidence . . . ." Fed. R. Civ. P.

15   56(e).  On summary judgment, the non-moving party's evidence need not be in a form that is

16   admissible at trial.  *See Burch*, 433 F.Supp.2d at 1119 (*citing Celotex Corp. v. Catrett*, 477 U.S.

17   317, 324 (1986)).  Instead, a court is concerned with the admissibility of the contents of the

18   evidence.  *Id.*  Thus, on summary judgment, "objections to the *form* in which the evidence is

19   presented are particularly misguided where, as here, they target the non-moving party's

20   evidence." *Burch*, 433 F.Supp.2d at 1119.  Accordingly, as long as a party submits evidence

21   which, regardless of its form, may be admissible at trial, it may be considered on summary

22   judgment. *Id.* at 1120.

23   The court now turns to defendants' objection that plaintiff's evidence lacks a proper

24   foundation or authentication.  In order to properly support or oppose summary judgment, the

25   party relying on affidavits and records must lay a proper foundation. *Beyne v. Coleman Sec.*

26   *Servs., Inc.*, 854 F.2d 1179, 1182 (9th Cir. 1988).  The court agrees that "whether the

1  authentication requirement should be applied to bar evidence when its authenticity is not actually

2  disputed is, however, questionable." *Burch*, 433 F.Supp.2d at 1120. "[W]here the objecting

3  party does not contest the authenticity of the evidence submitted, but nevertheless makes an

4  evidentiary objection based on purely procedural grounds," then the court should consider the

5  evidence. *Id.* In such a situation, it would appear equally probable that the documents are what

6  they purport to be as it is that they are not. *See Id.*

7          Here, defendants do not actually contest the authenticity of the documents plaintiff has

8  submitted. Defendants' general objection is particularly suspect because all the documents

9  plaintiff submits would find their source in the prison system, either in plaintiff's files or in the

10 prison bureaucracy. Thus, if there were a valid basis for contesting their authenticity, defendants

11 could unearth and present it. But they have not. Therefore, all defendants' objections for lack of

12 proper foundation and lack of authentication are overruled.

13         Defendants also object on hearsay grounds. This objection is overruled for two reasons.

14 The first is the form of the objection and the second is the nature of the non-moving party's

15 burden on summary judgment. The objections are *pro forma* in that defendants object to entire

16 documents, not particular statements. An objection based on hearsay inherently is bound to the

17 context in which the allegedly objectionable evidence is offered. *See Burch*, 433 F.Supp.2d at

18 1122 ("even seemingly appropriate objections based on hearsay and failures to authenticate/lay a

19 foundation are difficult to address away from the dynamics of trial.") Insofar as a letter or record

20 may on its face constitute hearsay, the particular statements upon which plaintiff relies may very

21 well either be admissible nonetheless or may not be hearsay, depending on the purpose for which

22 plaintiff offers the statement. "The court is not inclined to comb through these documents,

23 identify potential hearsay, and determine if an exception applies - all without guidance from the

24 parties." *Id.* at 1124. Thus, to prevail on a hearsay objection, defendants must object to

25 particular statements and explain the objection. Defendants' failure to do so is sufficient basis

26 for overruling the objection.

With respect to the nature of this proceeding, "the court cannot ignore the fact that a nonmovant in a summary judgment setting is not attempting to prove its case, but instead seeks only to demonstrate that a question of fact remains for trial." *Burch*, 433 F.Supp.2d at 1121. The court thus "treat[s] the opposing party's papers more indulgently than the moving party's papers." *Id.* (citing *Lew v. Kona Hosp.*, 754 F.2d 1420, 1423 (9th Cir. 1985)). While a court need not ignore the evidentiary ramifications of a declaration based nearly entirely on hearsay, *see Burch*, 433 F.Supp.2d at 1121 (noting that the Ninth Circuit does not uniformly apply the principle of indulgence), it is worth pointing out that plaintiff proceeds without counsel. Furthermore, he does not rely on evidence which on its face presents evidentiary obstacles which would prove insurmountable at trial. *See Id.* at 1122 (noting that at trial, "when a party raises valid evidentiary objections, the opposing party will have an opportunity to present the evidence in an alternative and admissible form."). Insofar as there may be valid hearsay objections, they are better left for trial, if there is to be one.

For these reasons, the defendants' objections to the plaintiff's evidence submitted in opposition to this motion are overruled.

**III. Facts**

Plaintiff has been incarcerated at High Desert State Prison (HDSP) since 1996. Defendant Stovall's Motion for Summary Judgment ("Stovall Mot. for Summ. J."), ¶ 1. Defendants are medical personnel at HDSP and provided care to plaintiff at varying times between 1998 and 2004, when this action commenced. Stovall Mot. for Summ. J., Stovall Decl., ¶2; Defendant James' Motion for Summary Judgment ("James Mot. for Summ. J."), James Decl., ¶ 2; Defendant Roche's Motion for Summary Judgment ("Roche Mot. for Summ. J."), Roche Decl., ¶2; Defendant Hlusak's Motion for Summary Judgment ("Hlusak Mot. for Summ. J."), Hlusak Decl., ¶¶ 7, 9-11.

Defendant Hlusak has been an optometrist for 30 years and has his own optometry practice in Susanville, California. Hlusak Decl., ¶ 1. For the last twelve years, Hlusak has

worked under a contract to provided optometry services at HDSP.  *Id*., ¶ 2.  When he prescribes

eyeglasses for an inmate at HDSP, this prescription does not require approval by anyone else in

the prison.  *Id*., ¶ 6.  When defendant Hlusak diagnoses a patient with keratoconus, it is his

custom and habit to review the different treatment options with the patient.  *Id*., ¶ 4.  As an

optometrist, it is not within his authority to prescribe or fit an inmate with hard contact lenses,

approve or perform surgery or effectuate a course of treatment of either contact lenses or surgery

for an inmate patient with keratoconus.  *Id*., ¶ 2, 4.  When Hlusak makes a recommendation that

an inmate be provided with hard contact lenses, he forwards that recommendation to HDSP

administration and, from there, the decision is out of his hands.  *Id*., ¶ 6.

Defendant James has been a physician since 1967 and worked in private practice for 35

years before coming to work at HDSP in May 2003.  James Decl., ¶¶ 1, 2.  James is currently

employed as a Staff Physician and Surgeon and is responsible for providing medical care to

inmates.  *Id*., ¶ 2.  James is a general family practitioner and not an eye specialist.  *Id*.  When a

patient comes to James complaining of vision problems, his custom and habit is to promptly

arrange for the patient to see an eye specialist after obtaining a medical history and conducting

an examination of the patient in order to attempt to determine the nature of the problem.  *Id*., ¶ 3.

This involves looking for any risk factors that may be present, such as other illnesses that the

patient may have.  *Id*.  If there is a fear of infection in the eye, he prescribes an antibiotic

ointment and eye patch.  *Id*.  There are temporary measures that are effective in preventing the

condition from getting worse during the time before the patient can see a specialist.  *Id*.  The

antibiotic ointment treats any infection, decreases irritation, and lubricates the eye.  *Id*.  The eye

patch allows the eye to rest and prevents from rubbing and scratching the eye.  *Id*.  James sits on

the Medical Authorization Review (MAR) committee with the other primary care providers at

HDSP.  *Id*., ¶ 7.  The MAR committee acts as a peer review body and is responsible for

approving requests for medical services otherwise excluded by Cal. Code Regs. Title 15, §§

3350 *et seq*.  *Id*.  Because it was the MAR committee that had the ultimate authority to decide on

1   the long-term course of plaintiff's treatment, James did not have the power to effectuate a

2   particular course of treatment.  *Id.*  It was the MAR committee that had the power to decide on

3   whether plaintiff's condition would be treated with hard contact lenses or with corneal transplant

4   surgery.  *Id.*

5       Defendant Roche has been a physician for approximately 29 years.  Roche Decl., ¶ 1.  He

6   worked in private practice from 1977 until 2000, when he began working for the Department of

7   Corrections at HDSP.  *Id.*, ¶ 2.  From 2001 to 2005, Roche served at different times as a Staff

8   Physician and Surgeon and as Chief Physician and Surgeon at HDSP.  *Id.*  When a patient comes

9   to him complaining of vision problems, his custom and habit is to promptly arrange for the

10  patient to see an eye specialist.  *Id.*, ¶ 4.  In the meantime, he obtains a medical history from the

11  patient and then conducts an examination in order to attempt to determine the nature of the

12  problem.  *Id.*  This involves looking for any risk factors that may be present, such as other

13  illnesses that the patient may have.  *Id.*  If there is concern about the possibility of an eye

14  infection, he prescribes an antibiotic ointment and eye patch.  *Id.*  These are temporary measures

15  that are effective in preventing the condition from getting worse during the time before the

16  patient can see a specialist.  *Id.*  The antibiotic ointment treats any infection, decreases irritation,

17  and lubricates the eye.  *Id.*  The eye patch allows the eye to rest and prevents the patient from

18  rubbing and scratching the eye.  *Id.*

19      Defendant Stovall is a Medical Technical Assistant ("MTA").  Stovall has been an MTA

20  at HDSP at all times relevant to the action.  Stovall Decl., ¶ 2.  Stovall was licensed as a

21  vocational nurse in 1992.  *Id.*, ¶ 3.  MTAs package medications and distribute them to the

22  inmates and are also the primary responder to emergency medical situations.  *Id.*, ¶ 5.  When an

23  inmate has a routine non-emergency medical condition, inmates must complete a sick-call slip.

24  An MTA collects these and delivers them to a Registered Nurse.  *Id.*  Stovall goes on rounds

25  each morning and did so on May 6, 2003.  *Id.*, ¶ 6.  This involves visiting eight different

26  buildings within C Yard, containing approximately 900 inmates.  *Id.*  The process takes at least

8

90 minutes. *Id.* While on rounds, if an inmate approaches Stovall about a medical issue, it is his custom and habit to first determine whether an acute situation exists that must be treated as an emergency. *Id.*, ¶ 7. This involves looking for conditions such as obvious injuries, chest pains, or breathing problems. *Id.* If he determines that a situation is an emergency, then he ensures that the inmate receives immediate medical attention. *Id.* If he determines a situation is not acute, then he instructs the inmate to complete a sick-call slip. *Id.* It is beyond the scop of an MTA's authority or license to assess or diagnose medical conditions. *Id.*, ¶ 8. MTAs do not treat eye conditions except in emergency situations where, for example, an inmate has gotten something in his eye. *Id.*

Plaintiff has suffered from keratoconus, an eye disease, for approximately nine years. Plaintiff's Verified Complaint ("Ver. Compl."), at 3 and Ex. A., p. 1; Hlusak Decl., ¶ 7. Plaintiff's condition has caused him to experience pain and continually worsening blurred vision. Ver. Compl., at 4. Defendants submit evidence that keratoconus is a progressive non-inflammatory disorder that causes characteristic thinning and cone-like steepening of the cornea. James Decl., ¶9; Roche Decl., ¶10; Hlusak Decl., ¶3. Defendants do not explain "cone-like steepening," but state that it results in a distortion of vision and an associated reduction in visual acuity. Defendant Hlusak states that in some cases, particularly in their early stages, keratoconus can be effectively treated with eyeglasses, but in most cases the most effective treatment is hard contact lenses. Hlusak Decl., ¶ 3. Dr. Roche submits evidence that contact lenses are used to treat keratoconus until the condition progresses to a stage where a corneal transplant is needed, but does not adduce evidence as to when that stage occurs or whether contact lenses are the course of treatment to be followed in all cases. Roche Decl., ¶ 10. Dr. Hlusak states that a corneal transplant is only necessary in cases in which the keratoconus advances to the point where the cornea thins and becomes cloudy and the patient suffers blindness. Hlusak Decl., ¶ 3. Dr. Hlusak does not explain "blindness" in medical or other terms, and does not adduce evidence as to the stage at which a patient with keratoconus may be

considered "blind."  Dr. Hlusak does not adduce evidence whether plaintiff in this case could or could not be considered "blind."  Dr. Hlusak further does not adduce any evidence regarding other instances in which corneal transplant surgery is necessary, such as the occurrence of contact lens intolerance.[1]  All defendant doctors submit evidence that a delay in transplant surgery that resulted from first trying eyeglasses or a hard contact lens fit, in and of itself, would not cause permanent damage to the vision of someone with keratoconus, and that it is the progressive nature of the disorder that ultimately results in the need for corneal transplant surgery.  Hlusak Decl., ¶ 3; Roche Decl., ¶ 10; James Decl., ¶ 9.  Defendant James, however, has proffered evidence in contradiction , in the form of a request for services that he made on plaintiff's behalf in which he states, "[c]loudy area of cornea– painful ... could lead to permanent damage, scarring of cornea."  James Decl., Ex. A, at 4.  Admittedly, James and Roche are not eye specialists, and the defendant optometrist, Dr. Hlusak, is not a surgeon.  Defendants do not explain this discrepancy in their evidence and provide no basis for evidence of their determination as to the need for corneal transplant surgery and whether permanent damage may result from a delay in performing such surgery.  Further, defendants do not adduce evidence of exactly what impact a delay in surgery would have upon the vision of a patient with keratoconus.

Plaintiff has a history of corneal hydrops which is a condition associated with keratoconus that causes painful and increased vision loss.  Hlusak Mot. for Summ. J., Frazier

////

////

---

[1] *See* The Merck Manual, 18th Edition, p. 900.  Contact lens intolerance occurs when the steepened, irregular cornea can no longer be fitted with a contact lens, or the patient cannot tolerate the lens.  *See* The National Keratoconus Foundation website at http://www.nkcf.org/.  Blurring, scratchiness, irritation, watering or any discharge may signal a problem with intolerance of contact lenses or the need for refitting.  *Id.*; *See also* The Kertoconus Center website at http://www.keratoconus.com/pkkc.html.  Many patients find their contact lenses uncomfortable and can only tolerate their contact lenses for a short period of time.  *Id.*

Decl., Attach., at 7, 8[2].  None of the defendants submit evidence as to the condition of corneal hydrops nor do they produce evidence of the effect of corneal hydrops on plaintiff.  None of the defendants adduce evidence that they at any time treated plaintiff for the pain associated with his condition.

Plaintiff first received medical treatment for keratoconus from defendant Dr. Hlusak on November 10, 1998.  Hlusak Decl., ¶¶ 2, 7.  During his appointment with defendant Hlusak, plaintiff claimed his distance vision was blurry, but did not complain about pain.  *Id.*, ¶ 7. Hlusak diagnosed plaintiff with keratoconus, explained treatment options, and informed plaintiff that eyeglasses were an option that would significantly improve his vision.[3]  *Id.*, ¶ 7.  Defendant Hlusak adduces no evidence as to whether plaintiff was in an early or advanced stage of the disease.  Plaintiff states that he was already wearing glasses that were not helping to alleviate his condition.  Pl.'s Resp. to Hlusak Stmt. of Undisp. Facts ("Pl.'s Resp."), at 4.  Dr. Hlusak saw plaintiff again in 1998 when plaintiff presented with a complaint of blurred vision, and at this time recommended corneal transplant surgery.   Ver. Compl., Ex. A, at 1.  Defendant Hlusak continued to see and treat plaintiff in 1999.  Hlusak Decl., ¶ 8.  Dr. Crepitane, who is not a party to this action, treated plaintiff on January 6, and June 2, 1999, and, finding no corneal decompensation at those times, recommended deferring surgery and referred plaintiff to optometry to try "special hard contact lenses."  Hlusak Decl., Ex., at 2-3.  Thereafter, Dr. Hlusak saw plaintiff again on June 17, 1999.  Ver. Compl., Ex. A, at 5.  At this time, plaintiff

---

[2]  Merck Manual, 18th Edition, p. 873; National Keratoconus Foundation, symptoms, http://www.nkcf.org; The Global Keratoconus Foundation, A General Overview of Vision Correction: Methods in the Correction of Keratoconus (in severe keratoconus the cornea can become extremely unstable, and breaks in its inner layer (Descemet's membrane) can lead to the accumulation of fluid in the tissue.  In this condition, known as acute hydrops, the cornea becomes waterlogged, the eye painful and inflamed, and the vision is severely reduced.)

[3]  Keratoconus necessitates frequent change of eyeglasses.  The Merck Manual, 18th Edition, p. 900.  In the early stages, vision can be corrected with glasses, but as the disease progresses, they are not able to correct the distortion caused by the irregular corneal surface. National Keratoconus Foundation, http://www.nkcf.org (accessed July 9, 2007).

complained of visual impairment and that his "eyes hurt," and Dr. Hlusak referred plaintiff to ophthalmology for treatment with hard contact lenses.  *Id*.  Dr. Hlusak again referred plaintiff to ophthalmology for fitting with hard contact lenses on October 5, 1999.  *Id.* at 6.  Dr. Hlusak also ordered a pair of glasses for plaintiff at this time.  *Id.*

Plaintiff states that because he was diagnosed as having a progressive eye disease, he should have been receiving chronic care, but defendants stopped plaintiff from receiving treatment until he could not bear the headache and filed another sick call slip.  Pl.'s Resp., at 4. It wasn't until April 1, 2003, that Hlusak became involved again in plaintiff's care.  Hlusak Decl., ¶ 9.  Hlusak noted that plaintiff had keratoconus and resultant macular opacity in both eyes and again referred plaintiff to ophthalmology for corneal transplant.  HD, ¶ 9 & Ex. A.

On May 2, 2003, plaintiff continued to have blurred vision in his right eye.  Stovall Mot. for Summ. J., Williams Decl., Ex. A, Plaintiff's Deposition ("Pl.'s Dep."), at 118.  The following day, plaintiff could not see anything out of his right eye.  Pl.'s Dep., at 118.  A corrections officer brought plaintiff to the emergency room where he received medical care from defendant Dr. Roche.  Roche Decl., ¶¶ 2, 5.

When a patient comes to Dr. Roche with a complaint of vision problems, he customarily arranges for the patient to see an eye specialist.  *Id*., ¶ 4.  Dr. Roche saw plaintiff in the prison emergency room on May 3, 2003, when plaintiff presented with complaints of irritation and pain in his right eye, that he had been suffering from blurry vision for years, and had that day woken up blind in his right eye.  *Id*., ¶ 5 & Ex. A at 1-2.  Roche noted that plaintiff had a corneal abrasion in his right eye and prescribed the use of an ophthalmic antibiotic ointment and eye patches.  *Id*. The antibiotic ointment and eye patches were provided to treat any possible infection (though none was seen), decrease irritation, and lubricate the eye.  *Id.*  The eye patches were provided to prevent plaintiff from rubbing and scratching the eye and, thus, making his eye worse.  *Id.*  After treating plaintiff, Roche wrote a referral to the Medical Action Review (MAR) committee and Dr. Steen, an ophthalmologist.  Roche Decl., ¶ 5 & Ex. A at 1.  Defendant Roche

1    adduces no evidence, however, that plaintiff's rubbing was the cause of the pain, abrasion or

2    irritation, nor evidence that he addressed the cause of plaintiff's pain or loss of vision.

3        Yet, Roche noted that plaintiff "needs surgery."  Roche Dec., Ex. at 3.  He filled out and

4    signed a "Request for Services" form on the same day that he saw plaintiff, requesting an

5    ophthalmology consult and surgery.  *Id.*  Roche also noted that plaintiff had been seen by

6    ophthalmology in March and that surgery was recommended, and that this recommendation

7    would be presented to the HDSP MAR committee.  *Id.*, at 2, 3.  Roche stated in his declaration

8    that although it was urgent that plaintiff have a consultation, it was not an emergency situation.

9    Roche Decl., ¶ 5.

10       Two days after plaintiff had seen Dr. Roche, on May 5, 2003, Registered Nurse

11   Rosemary Wilkerson noted that defendant Roche had approved plaintiff for an ophthalmology

12   consultation with Dr. Steen and made a notation in plaintiff's file that this request had been

13   approved.  Roche Mot. for Summ. J., Wilkerson Decl., ¶ 8.  It was not necessary that this request

14   be referred to the full MAR committee.  *Id.*, ¶ 9.  She then sent the approval on to the specialty

15   clinic for scheduling.  *Id.*, ¶ 8 & Ex. A at 1.

16       All primary care providers at HDSP sit on the MAR committee, which acts as a peer

17   review body and is responsible for approving requests for medical services otherwise excluded

18   by Cal. Code Regs. Title 15, §§ 3350 *et. seq.*  Wilkerson Decl., ¶ 4.  At each meeting of the

19   MAR committee, the doctor making a request for services will present the case and the full

20   committee will then vote on whether or not to approve the request.  *Id.*  Specifically, it was the

21   MAR committee that had the power to decide on whether plaintiff's condition would be treated

22   with hard contact lenses or with corneal transplant surgery.  Roche Decl., ¶ 8.  Because of the

23   volume of requests, the full MAR committee cannot and does not review every request for

24   services.  Wilkerson Decl., ¶ 6.  Many routine matters, such as referrals to specialty clinics or

25   outside specialists, will instead be approved by Wilkerson in her capacity as the Utilization

26   Management Nurse or after consultation with the Chief Medical Officer, the Chief Physician and

1    Surgeon, and/or the physician on call, all of whom can also approve matters upon their

2    determination that the requested service is reasonable given the patient's clinical presentation.

3    *Id.* As a result, these requests for services will not go to the full MAR committee for review. *Id.*

4    When a request is approved, it is routed to Wilkerson who logs the request, assigns it a tracking

5    number, and forwards it to the specialty clinic in order to schedule the service. Wilkerson Decl.,

6    ¶ 7.

7        On May 6, 2003, defendant MTA Stovall went on rounds. Stovall Decl., ¶ 6. Plaintiff

8    states that he showed defendant Stovall that his eye patch was dirty and irritating his eye and

9    Stovall said he would check into it. Stovall Mot. for Summ. J., Ex. A, Pl.'s Dep., at 199.

10   Plaintiff did not hear back from Stovall, then called the CO to be taken to the clinic. Pl.'s Dep.,

11   at 208. Plaintiff saw Stovall at about 7 a.m. and was called over to the clinic at about 9 a.m. *Id.*,

12   at 208-209. Stovall has no recollection of peaking to plaintiff on that day, however, if he had

13   approached Stovall with a complaint or concern about an eye patch which needed changing, his

14   custom and habit would have been to assess whether an emergent situation existed and, upon

15   finding none, would have instructed plaintiff to fill out a sick-call slip. Stovall Decl., ¶ 9. He

16   would not have considered a dirty eye patch to be an emergency. *Id.*

17       Defendant Glenn James first met with and provided medical care to plaintiff on May 7,

18   2003, when plaintiff claimed to be suffering from pain and impaired vision in his right eye.

19   James Decl., ¶ 4. He prescribed the continued use of the antibiotic ointment and eye patches that

20   Dr. Roche prescribed four days prior, because, though no infection appeared to exist, an

21   antibiotic ointment was prescribed prophylactically for any possible infection, to decrease

22   irritation, and lubricate the eye. *Id.* The eye patches prevented plaintiff from rubbing and

23   scratching his eye and, thus, making the eye worse. *Id.* Defendant James adduces no evidence,

24   however, that plaintiff's rubbing of his eye was causing the scratches or making his eye worse.

25   Five days later, on May 12, 2003, James ordered that the consultation with the ophthalmologist

26   be expedited and submitted a request for an ophthalmology consultation. *Id.* In his request, he

1   stated, "[p]ossible progressive corneal injury.  Cloudy area of cornea– painful.  Ruled out

2   dendrite ulcer etc.  Could lead to permanent damage, scarring of cornea."   James Decl., Ex. A at

3   4.  Although he classified this as an urgent request, plaintiff's condition did not present an

4   emergency situation.  *Id*. at 1-5.

5           The following month, on June 4, 2003, plaintiff was seen by Dr. Steen in the Specialty

6   clinic.  Dr. Steen informed plaintiff that HDSP did not have a contract with anyone who could

7   perform the corneal transplant surgery.  *Id*., at 3; Pl.'s Dep., at 119.

8           Two weeks later, on June 16, 2003, a copy of Dr. Steen's recommendations were sent to

9   Roche for disposition.  James Decl., Ex. A at 3.  Along with prescribing an ophthalmic solution,

10  Dr. Steen suggested transferring plaintiff to Vacaville for consult with a corneal specialist

11  regarding a corneal transplant.  James Decl., Ex. C at 1.

12          On July 2, 2003, defendant James examined plaintiff again and prescribed an ophthalmic

13  solution for his right eye to be used for 90 days.  James Decl., ¶ 5 & Ex. B at 1.  He also

14  submitted a routine request for services on behalf of plaintiff, requesting that plaintiff have a

15  consultation with Dr. Ivan Schwab, a corneal specialist at the UC Davis Medical Center,

16  regarding a possible corneal transplant.  *Id.*  This consultation had been requested and

17  recommended by Dr. Steen, the ophthalmologist who had seen plaintiff a month earlier on June

18  4, 2003.  James Decl., ¶ 5 & Ex. B at 2.

19          On July 7, 2003, Dr. Sandham, Chief Medical Officer at HDSP, sent to the Specialty

20  Clinic his approval to schedule plaintiff for a consult with a corneal specialist regarding a

21  diagnosis of keratoconus with possible corneal transplant needed.  James Decl., Ex. A at 3;

22  Wilkerson Decl., Ex. B at 1.

23          After two months, plaintiff was ducated to the Specialty Clinic on September 10, 2003,

24  for an interview in response to a grievance he had filed regarding his need for corneal transplant

25  surgery.  Roche Mot. for Summ. J., Ex. 2.  Plaintiff was told that the paperwork for his

26  appointment was sent to UC Davis Medical Center and that the reason it had taken so long was

1  that the corneal specialists that HDSP had contracts with do not perform that particular surgery,

2  so they had to look for another source.  *Id*.

3       On October 1, 2003, defendant Roche submitted a request for authorization to

4  temporarily remove plaintiff  from HDSP for a consultation with Dr. Ivan Schwab at the UC

5  Davis Medical Center regarding plaintiff's eye condition.  Roche Decl., ¶ 7 & Ex. B at 1.

6       On October 17, 2003, Dr. Schwab consulted with plaintiff.  In a letter to Dr. Sandham,

7  M.D. at HDSP, Dr. Schwab wrote that plaintiff had "bilateral keratoconus and poor vision

8  secondary to his disease process."  Schwab stated "[h]e will probably need corneal transplant in

9  one, or both, eyes and we would probably start with the worst eye, which after review, turns out

10  to be the left eye.  I would like to try a contact lens fit first, however, since this would avoid

11  surgery.  While I agree that he may need corneal transplant, I would like to be certain that a

12  contact lense fit is not possible. He has not tried contact lenses, and hence, we will try this first.

13  But, would then recommend corneal transplant if it is unsuccessful.  We will arrange for his

14  contact lens fit with your call and try to keep you apprised of our progress."  Roche Decl., Ex. C

15  at 1, 2.

16       A month after plaintiff's consultation with Dr. Schwab, at a November 4, 2003, meeting

17  of the MAR committee, defendant James requested that plaintiff be approved for a hard contact

18  lens fitting.  James Decl., ¶8; Wilkerson Decl., ¶ 10.  The MAR committee approved a hard

19  contact lens fitting for plaintiff.  Roche Decl., ¶ 9 & Ex. at 2; Wilkerson Decl., Ex. C at 1-2.

20  That approval was sent to the Speciality Clinic for scheduling with optometry.  Roche Decl., Ex.

21  at 2.

22       The following month, on December 9, 2003, Roche evaluated plaintiff again for his

23  keratoconus.  On that day, no swelling was noted but a recommendation was made to schedule

24  lab tests.  *Id*., at 1.

25       Although, as an optometrist Dr. Hlusak is without the authority to prescribe or fit an

26  inmate with hard contact lenses, he saw plaintiff again on December 18, 2003, to fit plaintiff

16

1   with hard contact lenses.  Hlusak Decl.,  ¶¶ 2, 6, 10; Roche Decl., Ex. at 1.  Plaintiff returned

2   three months later, on March 11, 2004, and received his hard contact lenses.  Hlusak Decl., ¶ 10.

3   Hlusak informed plaintiff of the need to wear the contacts while he was awake and also

4   instructed him on proper care for the lenses.  *Id.*

5        Plaintiff returned to Dr. Hlusak on April 29, 2004, the following month, for another

6   examination.  *Id.*, ¶ 11.  At this time, plaintiff complained that the hard contact lenses were

7   scratching his eyes and causing him discomfort.  *Id.*  Hlusak examined plaintiff and found that

8   there was no scratching present on plaintiff's cornea, but that there was scarring as a result of the

9   thinning of the cornea, caused by the progression of plaintiff's keratoconus.  Hlusak Decl., ¶ 11

10  & Ex. B.  Plaintiff told him that he had stopped wearing his contact lenses because the lenses

11  were causing him undue pain and he did not have access to the contact lens solution that Hlusak

12  had provided to him.  Hlusak Decl., ¶ 11; Pl.'s Resp. at 5-6.  Hlusak claims that plaintiff said that

13  he simply did not wish to wear the contacts.  Hlusak Decl., ¶ 11.  Hlusak doubted whether

14  plaintiff was actually experiencing any discomfort from the lenses, yet he does not submit

15  evidence that he considered and ruled out contact lens intolerance as the cause of the persistent

16  irritation to plaintiff's eye, nor does he submit evidence that he ruled out corneal hydrops as the

17  cause of plaintiff's discomfort.

18       Hlusak does not explain how wearing hard contact lenses without access to wetting and

19  cleaning solution could mitigate the pain and vision problems plaintiff was experiencing.  Hlusak

20  Decl., ¶ 12.  Hlusak states that he doubted plaintiff's complaint of pain because, as keratoconus

21  progresses, it causes increased corneal scarring that leads to a decrease in the ability of the

22  patient to feel anything in the cornea.  *Id.*  Hlusak states that in most cases of keratoconus where

23  the patient is treated with hard contact lenses, patients will not experience any discomfort, but he

24  does not adduce evidence that plaintiff's case was not exceptional.  *Id.*  Plaintiff states that the

25  contact was in fact irritating his eye, was difficult to remove, was causing his eye to become

26  bloodshot, and was not helping to increase his vision.  Pl.'s Resp. at 5.

1    Hlusak recommended that plaintiff be fitted with a second pair of hard contact lenses in

2    an effort to alleviate any discomfort he might have been feeling and to try again to halt the

3    progression of the keratoconus.  Hlusak Decl., ¶ 12 & Ex. B.  This was the last time that Hlusak

4    examined plaintiff prior to the filing of the lawsuit at issue.  Hlusak Decl., ¶ 12.  Plaintiff filed

5    suit in this action two months later.

6    Throughout the time Hlusak treated plaintiff, he never concluded that the drastic step of

7    corneal transplant was the appropriate course of treatment.  Hlusak Decl., ¶ 13.  Hlusak is not an

8    ophthalmic surgeon, but provides evidence that corneal transplant surgery, in his opinion, should

9    be a treatment of last resort, employed only when all other efforts have failed and the

10    keratoconus has advanced to the stage at which the patient has experienced complete blindness.

11    *Id*.  While under Hlusak's care, plaintiff's keratoconus never caused plaintiff to go "blind," in

12    Hlusak's opinion.  *Id*.  Hlusak does not provide evidence of the amount of vision loss required

13    for a patient to be considered "blind," nor does he adduce evidence as to the amount of vision

14    loss plaintiff was actually suffering.  Further, Hlusak does not adduce evidence as to when, in the

15    common opinion of the community of ophthalmic surgeons, corneal transplant surgery becomes

16    necessary.  Plaintiff states, however, that his complaint was due to blurry vision and pain, not

17    blindness.  Pl.'s Resp., at 7.  Plaintiff's complaint is not that defendants denied him care and that

18    denial caused him to become blind; his complaint is that defendants delayed his treatment,

19    causing him to endure pain and blurred vision for an unnecessarily protracted amount of time.

20    *Id*. at 6-8.

21    Hlusak submits evidence that he believed from the outset that plaintiff's condition could

22    most effectively be treated with hard contact lenses.  Hlusak Decl., ¶ 14.  Hlusak does not

23    explain why, therefore, he initially prescribed glasses for plaintiff instead.  He informed HDSP

24    that he would fit plaintiff with contact lenses, regardless of whether plaintiff could pay or not,

25    once HDSP has approved the treatment.  *Id*.  Plaintiff states that Hlusak only fitted plaintiff with

26    hard contact lenses after approval from HDSP to do so, and that Dr. Schwab's recommendation

1   was to have a specialist at UC Davis do the fitting instead.  *Id*., at 4-5.

2         Plaintiff provides evidence that he finally had some form of eye surgery on or about

3   August 31, 2006, approximately eight years after his initial diagnosis as having keratoconus by

4   defendant Hlusak, and two years after filing this action.  Pl.'s Opp'n, Ex. A.  None of the parties

5   submit evidence as to whether plaintiff received surgery on both eyes to treat his bilateral

6   kertoconus, as the need was identified by corneal specialist Dr. Schwab.

7   **IV.  Analysis**

8         Plaintiff alleges that defendants were deliberately indifferent to his eye condition.  He

9   faults defendants for delaying adequate medical treatment by deferring corneal transplant

10  surgery for the purpose of ruling out treatments that they allegedly should have known were

11  ineffective.  Plaintiff complains that he was prescribed additional eyeglasses when he already

12  had a pair, was not treated with hard contact lenses for a period of approximately five years, and

13  the hard contact lenses he finally received were ineffective and caused him pain.  To this date,

14  nothing in the record indicates that plaintiff has specifically undergone corneal transplant

15  surgery, the need for which was the ultimate consensus of his treating physicians, most of whom

16  are the defendants in this case.  All defendants assert that plaintiff has not produced evidence

17  that would prove that they delayed adequate medical care and that the evidence shows instead

18  that they took reasonable measures to treat plaintiff's condition.

19        A determination of "deliberate indifference" involves an examination of two elements:

20  the seriousness of the prisoner's medical need and the nature of the defendant's response to that

21  need.  "Because society does not expect that prisoners will have unqualified access to health

22  care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if

23  those needs are 'serious.'"  *Hudson v. MacMillian*, 503 U.S. 1, __, 112 S.Ct. 995, 1000 (1992).

24  A "serious" medical need exists if the failure to treat a prisoner's condition could result in

25  further significant injury or the "unnecessary and wanton infliction of pain."  *Gamble*, 429 U.S.

26  at 104, 97 S.Ct. at 291.  Either result is not the type of "routine discomfort [that] is 'part of the

penalty that criminal offenders pay for their offenses against society.' " *Hudson*, 503 U.S. at __,

112 S.Ct. at 1000 (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)). The existence of an

injury that a reasonable doctor or patient would find important and worthy of comment or

treatment; the presence of a medical condition that significantly affects an individual's daily

activities; or the existence of chronic and substantial pain are examples of indications that a

prisoner has a "serious" need for medical treatment. *See, e.g., Wood v. Housewright,* 900 F.2d

1332, 1337-41 (9th Cir.1990) (citing cases); *Hunt v. Dental Dept.*, 865 F.2d 198, 200-01 (9th

Cir. 1989).

Negligence is not enough for liability under the Eighth Amendment. *Farmer*, 511 U.S. at

835-36 and n4. An official's "failure to alleviate a significant risk that he should have perceived

but did not, . . . cannot under our cases be condemned as the infliction of punishment." *Id*. at

838. Instead, "the official's conduct must have been 'wanton,' which turns not upon its effect on

the prisoner, but rather, upon the constraints facing the official." *Frost v. Agnos*, 152 F.3d 1124,

1128 (9th Cir. 1998) (citing *Wilson v. Seiter*, 501 U.S. 294, 302-03 (1991)). Prison officials

violate their constitutional obligation only by "intentionally denying or delaying access to

medical care." *Estelle*, 429 U.S. at 104-05.

Prison officials violate the Eighth Amendment when they engage in "acts or omissions

sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v.

Gamble*, 429 U.S. 97, 106 (1976). A prison official is deliberately indifferent when he knows of

and disregards a risk of injury or harm that "is not one that today's society chooses to tolerate."

See *Helling v. McKinney*, 509 U.S. 25, 35 (1993); *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

The official must "be aware of the facts from which the inference could be drawn that a

substantial risk of serious harm exists, and he must also draw the inference." Farmer, 511 U.S.

at 837.

Deliberate indifference "may be manifested in two ways. It may appear when prison

officials deny, delay or intentionally interfere with medical treatment, or it may be shown by the

way in which prison physicians provide medical care." *Hutchinson v. United States*, 838 F.2d 390, 394 (9th Cir. 1988).  When prison medical personnel act based on "a medical judgment that either of two alternative courses of treatment would be medically acceptable under the circumstances, plaintiff has failed to show deliberate indifference, as a matter of law." *Jackson v. McIntosh*, 90 F.3d 330, 331 (9th Cir. 1996).  Prison officials provide constitutionally inadequate care when they know that a particular course of treatment is ineffective, but they do not alter it in an attempt to improve treatment." *See Jett v. Penner*, 439 F.3d 1091, 1097-1098 (9th Cir. 2006).  A medical need is serious if failure to treat the condition could cause further significant injury or the unnecessary and wanton infliction of pain. *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992).  Unnecessary continuation of pain may constitute the "harm" necessary to establish an Eighth Amendment violation from delay in providing medical care.  *Id.* at 1062.

It is undisputed that plaintiff suffers from the progressive eye disease keratoconus. Plaintiff's corneas have progressively become cone-shaped, causing him pain and distorting and blurring his vision to the point where he has complained of blindness.  It is also undisputed that plaintiff needed corneal transplant surgery, and that this was first concluded by Dr. Roche in 2003, then by Dr. Steen , Dr. Sandham, and ultimately by the specialist Dr. Schwab.  Further, it is undisputed that plaintiff's condition was continuously painful.  Plaintiff alleges that all doctors were aware of his condition, failed to adequately treat him, and caused unnecessary delay of recommended corneal transplant surgery.

**A.  Doctor Hlusak**

Plaintiff alleges that Dr. Hlusak knew that plaintiff needed corneal transplant surgery to alleviate pain and to prevent debilitating loss of vision, but unreasonably delayed this treatment. Dr. Hlusak asserts that plaintiff fails to show that the delay was unreasonable and, therefore, cannot demonstrate that he was deliberately indifferent to plaintiff's serious medical needs.  It is undisputed that on November 10, 1998, plaintiff saw Dr. Hlusak for blurred distance vision.  Dr.

1   Hlusak diagnosed plaintiff with keratoconus, a progressive disease that gradually causes loss of

2   vision.  It also is undisputed that in some cases, eyeglasses are an acceptable treatment, at least

3   in the early stages of the disease.  At the time of his first appointment with Dr. Hlusak, plaintiff

4   wore eyeglasses, but complained that they did not help.  As a result of the examination and

5   diagnosis, Dr. Hlusak gave plaintiff a new eyeglasses prescription.  There is no evidence of

6   whether this new prescription helped plaintiff, or if it did how long the benefit lasted.  Neither is

7   there any evidence about how progressed the disease was at that time or that plaintiff complained

8   of pain.  However, plaintiff presents no evidence that an updated prescription for his eyeglasses

9   was not an acceptable treatment at the time.  Indeed, plaintiff did not return to Dr. Hlusak for

10   treatment after receiving the glasses until five years had elapsed.

11          In the context of whether Dr. Hlusak was indifferent to plaintiff's plight, it is noteworthy

12   that as an optometrist, Dr. Hlusak was without the authority to fit a patient with contact lenses,

13   but appears to have gone to some effort to obtain approval to do so in plaintiff's case.  There is

14   no evidence to indicate that it was Dr. Hlusak's decision that he should fit plaintiff with the hard

15   contact lenses, despite his admission that he did so beyond the scope of his authority.  In fact,

16   plaintiff states that Hlusak only fitted plaintiff with hard contact lenses after approval from

17   HDSP to do so.  Pl.'s Resp., at 4-5.  Plaintiff complained that the contact lenses were causing

18   him pain rather than helping, and Hlusak prescribed a second pair.  Plaintiff submits no evidence

19   that the pain he experienced was caused by improper fitting rather than his lack of contact lens

20   solution, and no evidence as to whether the second pair of contacts prescribed by Dr. Hlusak

21   caused him pain.  The court now turns to the question of delay.

22          On each occasion that plaintiff met with Dr. Hlusak, Dr. Hlusak effected a course of

23   treatment to the best of his ability and promptly referred plaintiff to ophthalmology for treatment

24   outside his area of expertise.  Whether he ultimately made the best, or even correct choices given

25   the relevant standard of care is not the relevant question here.  It is not an issue of whether there

26   was medical negligence.  Rather, plaintiff must prove that the doctor was deliberately indifferent

1   to plaintiff's pain and eye disease.  The record simply cannot support such a conclusion here.

2   There is no evidence to indicate that Dr. Hlusak knew the eyeglasses or contacts were an

3   ineffective course of treatment but chose not to alter it.  The evidence shows that when Hlusak

4   decided to continue treating plaintiff with hard contact lenses, only a month had elapsed since

5   plaintiff received them and plaintiff admittedly had only worn them part of the time.  Therefore,

6   persisting with the treatment by ordering a second pair of contacts does not indicate an

7   unwillingness to alter a known ineffective course of treatment.

8       The evidence demonstrates that Dr. Hlusak treated plaintiff's condition to the best of his

9   ability and within the standards necessary to satisfy the constitutional requirements of the Eighth

10  Amendment.  The court finds that there is no genuine issue of material fact and therefore

11  recommends that defendant Hlusak's motion for summary judgment be granted.

12  **B.  Doctor Roche**

13      Plaintiff first saw Dr. Roche, a general physician, in the prison emergency room on May

14  3, 2003, a month following Hlusak's referral to ophthalmology.  Plaintiff presented with

15  complaints of irritation and pain in his right eye, and stated that he had been suffering from

16  blurry vision for years, and had that day woken up blind in his right eye.  Dr. Roche noted that

17  plaintiff "needs surgery," prescribed ophthalmic ointment and eye patches, and requested an

18  "urgent" ophthalmic consult.  Later, on October 1, 2003, Dr. Roche referred plaintiff for a

19  mandatory surgical consultation with Dr. Schwab, a corneal specialist at the University of

20  California, Davis.  Plaintiff presents no evidence that ointment and an eye patch was an

21  ineffective treatment to immediately alleviate his symptoms at the time, nor does he show that

22  Dr. Roche was in a position to provide plaintiff with the ultimate relief of a corneal transplant.

23  The evidence shows that on each occasion that he treated plaintiff, Dr. Roche responded to the

24  best of his ability and promptly referred him for an urgent ophthalmic consult, and then later to

25  see an off-site specialist.  The evidence does not demonstrate that Dr. Roche ignored or was

26  indifferent to plaintiff's conditions or refused to provide care within the standard necessary to

1   satisfy the constitutional requirements of the Eighth Amendment.  The court therefore finds no

2   genuine issue of material fact and recommends Dr. Roche's motion for summary judgment be

3   granted.

4       **C.  Doctor James**

5           Plaintiff first saw Dr. James on May 7, 2003, when, after seeing Dr. Roche and receiving

6   the eye patches and ointment, he presented with complaints that, although the swelling had

7   subsided, he was still experiencing pain and visual impairment.  Dr. James noted in his

8   examination that there was dense scarring over the central cornea anteriorly, concluded that

9   plaintiff should continue with the ophthalmic ointment and eye patch, and wrote an "urgent"

10  referral for outpatient ophthalmology consult due to "possible progressive corneal injury" that

11  "could lead to permanent damage."

12          Two months later, on July 4, 2003, Dr. James again treated plaintiff, noting the presence

13  of corneal hydrops, a painful condition secondary to keratoconus, and wrote a request for

14  services for plaintiff to have a corneal transplant ophthalmology consult.  Plaintiff provides no

15  evidence that Dr. James' recommendation to continue with the ointment and eye patch was

16  ineffective or that his response was otherwise deficient.  More importantly, there is no evidence

17  that Dr. James knew that the treatment was not effective but deliberately ignored that fact.  The

18  evidence shows that Dr. James treated plaintiff to the best of his ability and promptly referred

19  plaintiff for an urgent ophthalmic consult, and then later to see an off-site specialist.  These facts

20  demonstrate that Dr. James' treatment was within the requisite standard to satisfy the Eighth

21  Amendment.  The court finds no genuine issue of material fact and therefore recommends Dr.

22  James' motion for summary judgment be granted.

23      **D.  MTA Stovall**

24          The court finds that there is no genuine issue of material fact for trial with respect to

25  defendant Stovall, as well.  There is no evidence that the two hours between plaintiff's complaint

26  to defendant Stovall and his emergency treatment was a result of any undue delay on defendant

1   Stovall's part.  There is simply no evidence to suggest the Stovall ignored or was indifferent to

2   plaintiff's condition.  The court finds no genuine issue of material fact as to whether Stovall's

3   response was deliberately indifferent to plaintiff's needs.  The court therefore recommends that

4   defendant Stovall's motion for summary judgment be granted.

5   **V.  Plaintiff's Motion for Summary Judgment**

6         Plaintiff also moves for summary judgment.  For the reasons set forth above concluding

7   that summary judgment must be granted in favor of the defendants, the court recommends that

8   plaintiff's motion for summary judgment be denied.

9   **VI.  Plaintiff's Claims Against Defendant Baron**

10        Defendant Baron filed an answer in this action on June 29, 2007, raising the affirmative

11  defense that plaintiff has failed to state a claim upon which relief may be granted under Fed. R.

12  Civ. P. Rule 12(b)(6).  Pursuant to 42 U.S.C. § 1997e(c)(1):

13          The court shall on its own motion or on the motion of a party dismiss any action
            brought with respect to prison conditions under section 1983 of this title, or any
14          other Federal law, by a prisoner confined in any jail, prison, or other correctional
            facility if the court is satisfied that the action is frivolous, malicious, fails to state
15          a claim upon which relief can be granted, or seeks  monetary relief from a
            defendant who is immune from such relief. In reviewing a complaint, the court
16          shall dismiss the complaint, or any portion of the complaint, if the complaint fails
            to state a claim upon which relief may be granted.  28 U.S.C. § 1915(b).
17

18        Plaintiff alleges in his complaint that on April 23, 2003, he submitted a 602 form appeal

19  to defendant Baron, who was at the time the Chief Medical Officer at HDSP.  Ver. Compl., at 5.

20  Plaintiff states that, in the appeal, he informed defendant Baron of the pain he was experiencing

21  in his right eye.  *Id.*  Plaintiff alleges that defendant Baron did not respond to this appeal and

22  therefore violated plaintiff's constitutional right to adequate medical attention.  Plaintiff attaches

23  as an exhibit to his complaint an appeals screening form, date June 5, 2003, indicating that

24  plaintiff's appeal was rejected because he did not first attempt to resolve his grievance at the

25  informal level by sending it directly to the Medical Department.  Ver. Compl., Ex B-1 at 1.

26  ////

1   Further, the screening form states in print, "this is a request . . . it is not an appeal. Submit a CDC

2   7362." *Id*. Additional handwritten notation states "Request for health care services. Not an

3   emergency appeal.  You need to submit a CDC 7362 or see MTA at facility clinic." *Id*.

4   Plaintiff's appeal was answered.  That it was rejected for plaintiff's failure to follow proper

5   procedure does not give rise to a constitutional claim.  Plaintiff has failed to allege facts

6   sufficient to state a claim against defendant Baron.  The court therefore recommends that

7   defendant Baron be dismissed from this action.

8           Accordingly, it is hereby RECOMMENDED that:

9           1.  Defendant Hlusak's October 8, 2006, motion for summary judgment be granted;

10          2.  Defendants Roche and James' October 8, 2006, motion for summary judgment be

11   granted;

12          3.  Defendant Stovall's September 7, 2006, motion for summary judgment be granted;

13          4.  Plaintiff's September 15, 2006, motion for summary judgment be denied;

14          5.  Defendant Baron be dismissed from this action; and

15          6.  The Clerk of the Court be directed to close this case.

16          These findings and recommendations are submitted to the United States District Judge

17   assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within 14 days after

18   being served with these findings and recommendations, any party may file written objections

19   with the court and serve a copy on all parties.  Such a document should be captioned "Objections

20   to Magistrate Judge's Findings and Recommendations."  Failure to file objections within the

21   specified time may waive the right to appeal the District Court's order. *Turner v. Duncan*, 158

22   F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

23   Dated:  August 31, 2007.

24                                                    EDMUND F. BRENNAN
25                                                    UNITED STATES MAGISTRATE JUDGE
26